**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-829-MN-CJB |
| | ) | |
| DELAWARE DEPARTMENT OF | ) | |
| INSURANCE, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court is a petition (the "Petition") brought by Petitioner United States of America (the "Government" or "Petitioner"), to enforce an Internal Revenue Service ("IRS") summons (the "Summons") served on Respondent Delaware Department of Insurance ("DDOI" or "Respondent"). (D.I. 1) Also pending is DDOI's motion seeking to quash the Summons, or in the alternative, for a protective order (the "Motion"). (D.I. 16) For the reasons set forth below, the Court recommends[1] that the Petition be GRANTED and that the Motion be DENIED.

## I.     BACKGROUND

### A.     Factual Background

The facts underlying this dispute involve the IRS' investigation of the role of certain entities that have been involved in transactions related to micro-captive insurance companies.

---

[1]     Although the law is not entirely clear on this point, Courts have generally held that in reviewing an IRS petition to enforce a taxpayer summons issued pursuant to 26 U.S.C. § 7602, a United States Magistrate Judge should issue a Report and Recommendation, as such petitions are considered dispositive matters. *See, e.g.*, *United States v. Olvany*, Civil Action No. 11-CV-2041, 2012 WL 2357713, at *1 & n.1 (M.D. Pa. Mar. 12, 2012), *report and recommendation adopted*, 2012 WL 2344661 (M.D. Pa. Jun. 20, 2012); *United States v. Bell*, 57 F. Supp. 2d 898, 900-05 (N.D. Cal. 1999).

(D.I. 1 at ¶¶ 4-5)  DDOI has issued insurance certificates to these insurance companies.  (*Id*. at ¶ 8)  Below, the Court will first discuss facts relevant to captive insurance companies, and then it will discuss facts related to the Summons giving rise to the instant dispute.

### 1. Captive Insurance Companies and Relevant Provisions of the Delaware Insurance Code

A captive insurance company (or "captive insurer") is an insurance company that is wholly owned and controlled by its insureds.  (D.I. 17 at ¶ 11)  Its primary purpose is to insure the risks of its owners, who in turn benefit from the captive's insurer's underwriting profits.  (*Id.*)  Business entities that are experienced in establishing and managing captive insurance companies are called "Captive Managers"; these Captive Managers facilitate the creation, formation and management of captive insurers in certain jurisdictions that have passed captive insurance legislation, like Delaware.  (*Id.* at ¶ 14)

Chapter 69 of the Delaware Insurance Code, also known as "Delaware Captive Law," is a part of the state statutory scheme that governs the formation, licensing and regulation of captive insurers.  (*Id.* at ¶ 9)  Under Chapter 69, a captive insurer can be formed and structured in a number of ways.  (*Id*. at ¶ 12)  Relevant to this case are "micro-captive" insurers, which are small captive insurance companies that are taxed under Section 831(b) of the United States Tax Code.  (*Id*. at ¶¶ 12-13)  Section 831(b) permits micro-captive insurers to be taxed not on underwriting income, but on investment income at or below a certain threshold for that tax year. 26 U.S.C. § 831(b).  This tax treatment can be favorable to micro-captive insurers.

Section 6920 of the Delaware Insurance Code ("Section 6920") relates to the confidential treatment of materials and information that captive insurers submit to the state tax commissioner, either directly or through DDOI, as part of the application and licensing process. (D.I. 17 at ¶ 20)  Section 6920 reads as follows:

All portions of license applications reasonably designated confidential by or on behalf of an applicant captive insurance company, all information and documents, and any copies of the foregoing, produced or obtained by or submitted or disclosed to the Commissioner pursuant to subchapter III of this chapter of this title that are reasonably designated confidential by or on behalf of a special purpose financial captive insurance company, and all examination reports, preliminary examination reports, working papers, recorded information, other documents, and any copies of any of the foregoing, produced or obtained by or submitted or disclosed to the Commissioner that are related to an examination pursuant to this chapter must, unless the prior written consent (which may be given on a case-by-case basis) of the captive insurance company to which it pertains has been obtained, be given confidential treatment, are not subject to subpoena, may not be made public by the Commissioner, and may not be provided or disclosed to any other person at any time except:

(1) To the insurance department of any state or of any country or jurisdiction other than the United States of America; or

(2) To a law-enforcement official or agency of this State, any other state or the United States of America so long as such official or agency agrees in writing to hold it confidential and in a manner consistent with this section.

DEL. CODE ANN. tit. 18, § 6920 (2007).

## 2.    IRS Summons and Subsequent Events

The facts giving rise to this dispute arose from an IRS investigation of the role of non-parties Artex Risk Solutions, Inc. ("Artex"), Tribeca Strategic Advisors, LLC ("Tribeca") (which is owned by Artex) and others, in transactions involving micro-captive insurance plans. (D.I. 1 at ¶¶ 4-5; D.I. 3 at ¶ 3)  The IRS was investigating, *inter alia*, whether Artex or Tribeca violated federal laws by promoting micro-captive insurance schemes.  (D.I. 1 at ¶ 5; D.I. 3 at ¶ 4)  The IRS has designated such micro-captive insurance schemes (e.g., schemes in which the taxpayer inappropriately seeks to shield income from taxation through the use of sham insurance companies) as a "Transaction of Interest," and both the IRS and the United States Tax

Court have found that the schemes can be used to avoid or evade taxes.[2] (D.I. 1 at ¶ 6 (citing I.R.S. Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016))) As part of the Artex investigation, in December 2013, the IRS issued two administrative summonses to Artex. *United States v. Artex Risk Sols., Inc.*, No. 14 C 4081, 2014 WL 4493435, at *1 (N.D. Ill. Sept. 11, 2014) (*cited in* D.I. 1 at ¶ 9). Artex ultimately produced certain documents pursuant to these summonses, including certain e-mail correspondence between Artex and DDOI. (D.I. 1 at ¶¶ 9-11; D.I. 3 at ¶ 5)

On October 30, 2017, the IRS issued to DDOI the Summons at issue here; the Summons seeks information pertaining to approximately 200 insurance certificates of authority that DDOI issued to micro-captive insurance companies associated with Artex and Tribeca.[3] (D.I. 1 at ¶¶ 4, 8, 14; D.I. 3 at ¶¶ 6, 16; D.I. 5) The Summons included a request for testimony and four requests for records; the first such records request ("Request 1") asked that DDOI "[p]rovide all electronic mail between [DDOI] and Artex and/or Tribeca related to the Captive Insurance Program[.]" (D.I. 5 at 1, 17; *see also* D.I. 19 at 5)

On November 28, 2017, DDOI issued to the IRS its objections and responses to the Summons, including confidentiality objections brought pursuant to Section 6920. (D.I. 19 at 5)

---

[2] Artex and Tribeca have also been sued by 49 plaintiffs seeking to bring a class action lawsuit alleging damages "sustained in connection with . . . micro-captive insurance strategies that [Artex and Tribeca] 'designed, developed, promoted, sold, implemented[] and managed[.]'" (D.I. 1 at ¶ 7 (citation omitted)) Those plaintiffs sought compensation for damages arising from micro-captive insurance strategies that they entered into and utilized on their federal and state tax returns, on the advice of Artex and Tribeca, from 2005 onwards. (*Id.*)

[3] In its filings, the Government asserted that DDOI has issued approximately 191 insurance certificates of authority to micro-captive insurance companies associated with Artex. (D.I. 1 at ¶ 8; D.I. 3 at ¶ 6) In its briefing, DDOI states that it has licensed 225 captive insurance companies managed by Artex, of which 210 are micro-captives, with only 68 of those being currently active. (D.I. 19 at 5)

On the same date, DDOI also produced approximately 169 documents to the IRS, and on April 30, 2018, DDOI produced an additional approximately 125 pages of documents. (D.I. 1 at ¶¶ 17-18; D.I. 3 at ¶¶ 10-11) None of these additional documents included any e-mails. (D.I. 1 at ¶ 18; D.I. 3 at ¶ 11) Thereafter, counsel for the Government and the DDOI had further discussions, in which the Government sought to obtain DDOI's voluntary compliance with Request 1. (D.I. 1 at ¶ 19) As a result of those discussions, DDOI agreed to produce documents on a rolling basis that DDOI believed were responsive to the subpoena but that were not client-specific. (*Id.*) Between 2018-2019, DDOI produced approximately 1,591 pages of such documents; DDOI represents that these constitute all non-client specific documents in its possession, custody or control that are responsive to Request 1. (*Id.*; D.I. 3 at ¶ 12; *see also* D.I. 19 at 5-6)

As for the client-specific documents in DDOI's possession responsive to Request 1, DDOI refused to produce those to the IRS. Instead, in October 2019 and again in February 2020, DDOI sent communications to all of the micro-captive insurance companies associated with Artex; in these communications, DDOI asked the companies to voluntarily consent to DDOI's release of the documents to the IRS. (D.I. 1 at ¶ 20; D.I. 3 at ¶ 13) In total, only 19 of the affected micro-captive insurance companies consented to such production, and DDOI later produced to the IRS responsive files (totaling over 1,800 pages) for those entities.[4] (D.I. 1 at ¶ 20; D.I. 3 at ¶ 13; *see also* D.I. 19 at 6-7 & n.3)

---

[4]     In its Petition, the Government alleged that DDOI had produced such records for 16 micro-captive insurance companies. (*See* D.I. 1 at ¶¶ 8, 20; D.I. 3 at ¶ 13) In its briefing, DDOI contended that the correct number was 19, as it has subsequently produced three more company-specific files after receiving the relevant consents. (D.I. 19 at 6-7 & n.3)

At present, then, DDOI has not produced documents responsive to Request 1 that are client-specific and relate to micro-captive insurance companies that have not consented to the production. (D.I. 1 at ¶¶ 9, 12, 16; D.I. 3 at ¶ 15; *see also* D.I. 5, exs. 3-4) DDOI also has not provided the testimony demanded by the IRS in the Summons. (D.I. 1 at ¶ 16; D.I. 3 at ¶ 9) With the instant Petition, the Government seeks these outstanding documents and testimony. (D.I. 1 at ¶ 26)

Additional relevant facts will be provided below in Section II.

### B.       Procedural Background

The Government filed the Petition on June 19, 2020, along with a supporting declaration authored by IRS Revenue Agent Bradley Keltner (the "Keltner Declaration"). (D.I. 1; D.I. 3) On October 15, 2020, United States District Judge Maryellen Noreika referred this case to the Court to hear and resolve all pre-trial matters up to and including expert discovery matters. (D.I. 6)

On January 11, 2021, the Court entered an Order to Show Cause directing DDOI to submit its defense or opposition to the Petition; the Court also set a show cause hearing for February 22, 2021. (D.I. 8) On February 8, 2021, DDOI filed its opposition to the Petition, (D.I. 15), and on the same day, DDOI also filed the instant Motion, (D.I. 16) Because briefing on the Motion would not have been completed prior to the scheduled February 22nd hearing, the Court rescheduled a hearing on the Petition and the Motion for March 12, 2021. (D.I. 22) On February 24, 2021, briefing was completed on the Petition, (D.I. 23), and on March 3, 2021, briefing was completed on the Motion, (D.I. 25). On March 12, 2021, the Court held the hearing and heard argument on the Petition and the Motion. (Docket Item, March 12, 2021 (hereinafter, "Tr."))

## II.    DISCUSSION

As was noted above, there are two pending requests for relief:  the Petition and the

Motion.  However, because the Court concludes that DDOI is prohibited from filing the Motion,

it recommends that the Motion be denied.[5]  Therefore, the Court will address the parties'

arguments solely as they relate to the Petition.

In challenging the Petition, DDOI makes two primary legal arguments.  The Court will

address each argument in turn.

### A.    DDOI's Argument Regarding the Third *Powell* Factor

---

[5]        DDOI's Motion is styled as a "Motion of [DDOI] to Quash the Petition to Enforce Summons or in the Alternative, for Protective Order."  (D.I. 16)  But as the Government notes, (D.I. 24 at 1-3), the Internal Revenue Code includes regulations regarding who may file legal process seeking to quash such a Petition.  Those regulations state that:  (1) only persons "entitled to notice of a summons" (here, Artex and Tribeca are the parties entitled to notice, not DDOI) may begin a proceeding "to quash such summons" (which the regulations refer to as a "petition" to quash, not a "motion" to quash); (2) those persons must do so "not later than the 20th day after the day such notice is given" (here, since DDOI was not entitled to receive notice, it could not file a petition to quash within 20 days of when any such notice was given; moreover, even if service of the Petition on DDOI is treated as being akin to such notice, DDOI did not file the Motion within 20 days of being served); and (3) the persons must "mail by registered or certified mail a copy of the petition to the person summoned" (here, DDOI itself is the person summoned, and it does not assert that it mailed notice of its Motion to itself). 26 U.S.C. § 7609(a)-(b); *see also Viewtech, Inc. v. United States*, 653 F.3d 1102, 1104 (9th Cir. 2011) ("The issue of who gets notice is highly significant because only a person who is entitled to notice may bring a proceeding to quash such a[n IRS] summons.") (citation omitted).  In its answering brief on the Motion, the Government explained that DDOI had failed to meet each of these three requirements.  (D.I. 24 at 1-3)  Yet its reply brief on the Motion, DDOI failed to substantively respond to the Government's arguments in this regard.  (*See* D.I. 25 at 9)  At oral argument, DDOI's counsel seemed to concede that in light of these failures, DDOI was not permitted to file the Motion.  (Tr. at 57-58)  So for all three of these reasons, the Court is recommending denial of the Motion.

The Court notes, however, that both sides seem to agree that denial of the Motion would not affect the Court's ability to consider the substance of all of the arguments at issue.  This is because DDOI is empowered to make all of the same arguments it pressed in its Motion briefing in opposing the Government's Petition.  (D.I. 24 at 2 n.2)

In explaining DDOI's first argument, the Court must first set out the relevant law with regard to the Summons and any challenges thereto. After doing so, the Court will analyze DDOI's argument.

### 1. IRS' Summons Power

The IRS is tasked with the responsibility of administering and enforcing the Internal Revenue Code. 26 U.S.C. § 7601; *Donaldson v. United States*, 400 U.S. 517, 523 (1971). The IRS has the authority under Section 7602 of the IRS Code to examine records, summons persons with relevant information and take testimony relevant to such inquiries. 26 U.S.C. § 7602(a); *United States v. Euge*, 444 U.S. 707, 710-11 (1980); *United States v. Rockwell Int'l*, 897 F.2d 1255, 1261 (3d Cir. 1990). "As a tool of discovery, the [Section] 7602 summons is critical to the investigative and enforcement functions of the IRS[.]" *United States v. Arthur Young & Co.*, 465 U.S. 805, 814 (1984) (noting that "Congress has endowed the IRS with expansive information-gathering authority" and that "[Section] 7602 is the centerpiece of that congressional design") (citation omitted). As a result, courts construe the summons authority in Section 7602 broadly. *See Euge*, 444 U.S. at 714.

In a summons enforcement action, the United States has the initial burden of making a *prima facie* case that its summons is valid. *United States v. Cortese*, 614 F.2d 914, 919 & n.7 (3d Cir. 1980) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). To meet its burden, the Government must show: (1) "that the investigation will be conducted pursuant to a legitimate purpose"; (2) "that the inquiry may be relevant to the purpose"; (3) "that the information sought is not already within the [IRS'] possession"; and (4) "that the administrative steps required by the Code have been followed." *Rockwell Int'l*, 897 F.2d at 1262 (quoting *Powell*, 379 U.S. at 57-58) (internal quotation marks omitted). The Government typically

8

satisfies its obligation to show the applicability of these four factors (known as the "*Powell* factors") by submitting an affidavit from the investigating agent. *G2A.COM Sp. z.o.o. (Ltd.) v. United States*, 789 F. App'x 296, 300 (3d Cir. 2019) (citations omitted).

Once the United States meets its initial burden, the burden of proof shifts to the respondent to oppose enforcement of the summons and to rebut the Government's allegations. *Id.*; *see also Cortese*, 614 F.2d at 919 n.7. To do so, the respondent must demonstrate that enforcing the summons would result in an "abuse of the court's process." *United States v. Garden State Nat'l Bank*, 607 F.2d 61, 71 (3d Cir. 1979) (internal quotation marks and citation omitted); *see also G2A.COM Sp. z.o.o. (Ltd.)*, 789 F. App'x at 300 (internal quotation marks and citation omitted). This burden is a "heavy" one. *G2A.COM Sp. z.o.o. (Ltd.)*, 789 F. App'x at 300; *Cortese*, 614 F.2d at 919.

A summonsed party may challenge the summons "on any appropriate ground." *Rockwell Int'l*, 897 F.2d at 1262 (internal quotation marks and citation omitted). An "appropriate ground" for challenging the summons exists when the respondent disproves one of the four elements of the government's *prima facie* showing, or otherwise demonstrates that enforcement of the summons will result in an abuse of the court's process. *Id.* (internal quotation marks and citations omitted). A respondent may only assert facts opposing the *prima facie* case by affidavit; "[l]egal conclusions or mere memoranda of law will not suffice." *Garden State Nat'l Bank*, 607 F.2d at 71 (citing *Thornton v. United States*, 493 F.2d 164, 167 (3d Cir. 1974)). Absent such a response, any uncontested allegations "must be accepted as admitted." *Id.* Moreover, if at this stage the respondent cannot refute the Government's *prima facie* showing or cannot support a proper affirmative defense, the district court should dispose of the proceeding on the papers before it without an evidentiary hearing. *Id.*

### 2. Argument

DDOI's first argument is that the Government has failed to make out a *prima facie* showing as to the third *Powell* factor (i.e., "that the information sought is not already within the [IRS'] possession"). Alternatively, even if the Government sufficiently made a *prima facie* showing as to this factor, DDOI argues that it has successfully rebutted or disproved the applicability of that factor.

In arguing that the Government failed to make out its *prima facie* case, DDOI points to paragraph 15 of the Keltner Declaration. (D.I. 19 at 19) In that paragraph, Agent Keltner notes that he has compared the documents DDOI has produced to the IRS with documents that Artex produced in its summons enforcement action; Agent Keltner explains that that the comparison indicates that "there are documents responsive to Request 1 of the [S]ummons in the possession of the DDOI that the DDOI has not produced." (D.I. 3 at ¶ 15) Here, the "documents" that Agent Keltner was referring to (at least in part) were two e-mails sent between DDOI and Artex, which had been produced to the IRS in the Artex investigation. (*Id.* at ¶ 5) Agent Keltner's point here was that he knew that DDOI likely possessed at least some unproduced documents responsive to Request 1—because the IRS had already obtained copies of two DDOI/Artex e-mails from Artex, and copies of those very e-mails (plus other similar e-mails between DDOI and Artex) would likely be in DDOI's possession too. But DDOI seizes on paragraph 15 and argues that since the IRS already had possession of the content of these two e-mails, this means that the third *Powell* factor cannot be satisfied, since the "documents that are the subject of the Petition are already in the possession of the IRS." (D.I. 19 at 19)

The Court disagrees, and concludes that the Government met its burden as to this third *Powell* factor. After all, the Keltner Declaration explicitly addressed this factor. In doing so,

Agent Keltner explained that DDOI had already produced some documents responsive to Request 1, specifically its production of: (1) 169 pages of non-e-mail documents in November 2017; (2) 125 pages of non-e-mail documents in April 2018; (3) 1,591 pages of non-client-specific documents; and (4) over 18,000 pages of documents associated with those micro-captive insurance companies that consented to DDOI's release of their information. (D.I. 3 at ¶¶ 10-13) But the Keltner Declaration also explains that other than these already-produced documents, "the [sought-after] documents described in Request 1 of the [S]ummons are not already in the possession of the IRS." (*Id.* at ¶ 14) Moreover, by referencing at least certain DDOI/Artex e-mails that the IRS had already obtained from Artex (as described above)—e-mails that DDOI had not yet produced to the IRS—Agent Keltner provided some support for his conclusion about the applicability of the third *Powell* factor. An investigating agent's declaration that certain information at issue is not in the IRS' possession is typically sufficient to make out a *prima facie* case as to this factor. *See G2A.COM Sp. z.o.o. (Ltd.)*, 789 F. App'x at 300; *Smith v. IRS*, Misc. No. 16-79-LPS, Misc. No. 16-165-LPS, 2018 WL 605870, at *2 (D. Del. Jan. 29, 2018); *see also Conner v. United States*, 434 F.3d 676, 681 (4th Cir. 2006); *United States v. Swanson Flo-Sys., Co*., Civil No. 11-mc-0012 (JNE/SER), 2011 WL 1831710, at *4 (D. Minn. Apr. 13, 2011). And we have that here.

To the extent that DDOI attempts to rebut the Government's *prima facie* showing and disprove that the Government has satisfied the third *Powell* factor, the Court concludes that DDOI has failed to meet its "heavy" burden in that regard. The Court understands DDOI's argument to the contrary: that the IRS already has "possession" of the two e-mails called out in the Keltner Declaration, in that it previously received those e-mails from Artex. But even as to these two e-mails alone, the "information sought" by the IRS here is the *versions of the e-mails*

*that are in DDOI's possession*.  (D.I. 3 at ¶¶ 5, 15; D.I. 23 at 9 & n.4; Tr. at 60, 62-63)  These

versions are *not* currently in the IRS' possession, since DDOI has never produced them to the

IRS.  And obtaining the particular versions of those e-mails that are in DDOI's possession could

be of independent evidentiary value to the IRS.[6]  *Cf. Tuka v. United States*, No. 2:08-mc-206,

2009 WL 606096, at *2, *4 (W.D. Pa. Mar. 9, 2009) (enforcing an IRS summons after rejecting

petitioner's argument that "the substance of the information contained on [the sought-after]

Form 1099 is already in the possession of the IRS" where the IRS agent acknowledged that "the

IRS can electronically generate an 'IRP Report' that shows information contained on the Form

1099; however the IRS does not have the actual Form 1099s" and where the "Form 1099 is

'sufficiently different in format from the electronic information as to be likely to have

independent evidentiary value in an investigation'"); *United States v. Ghafourifar*, No. C14-

03819 HRL, 2014 WL 6601858, at *1, *3 (N.D. Cal. Nov. 19, 2014) (enforcing an IRS

summons for copies of QuickBooks financial files, where respondent's attorney "exported the

financial records from QuickBooks files into Microsoft Excel format[] and emailed them to the

[IRS agent,]" with the court noting that "although [r]espondent provided certain information

from the QuickBooks files, he has not produced the QuickBooks files themselves. . . . The

QuickBooks files are likely to have independent evidentiary value in [the IRS agent]'s

---

[6]     Nor is it clear to the Court that the sought-after versions of these two e-mails are
necessarily the "same" versions of the e-mails that have already been obtained from Artex.  As
Government's counsel noted, even though the Government has already obtained the two e-mails
from Artex and now seeks the "same" e-mails from DDOI, the "information sought" from
DDOI really is not exactly the "same" as the information that the Government has already
sought and obtained from Artex.  (Tr. at 63-64)  That is because when it comes to electronic
discovery like this, the DDOI versions of the e-mails will contain metadata unique to those
documents—even if the content in the body of the e-mails is "substantially similar" to the
version of those e-mails that the Government has already obtained from Artex.  (*Id.*)

investigation. . . . That the IRS is already in possession of some of the requested information does not bar enforcement of the summons") (citation omitted).

The Court's decision here is also supported by the outcome in *Sugarloaf Funding, LLC v. U.S. Dept. of the Treasury*, 584 F.3d 340 (1st Cir. 1990). In *Sugarloaf*, the United States Court of Appeals for the First Circuit addressed a challenge to two IRS administrative summonses served on an attorney; the summonses sought, *inter alia*, the production of documents regarding the appellants, in connection with an investigation of potentially improper tax shelters. 584 F.3d at 343-44. The appellants challenged the summons as to the third *Powell* factor, arguing that the IRS was already in possession of the summoned documents, since one of the appellants and the appellants' accountant had already appeared for interviews and produced documents to the IRS. *Id.* at 350. The First Circuit, however, easily dismissed that argument. In doing so, the *Sugarloaf* Court explained that "the IRS is entitled to obtain relevant records from third parties to compare for accuracy any records obtained from the taxpayer."[7] *Id.*; *see*

---

[7] The Court disagrees with DDOI that the circumstances here are similar to those in *United States v. Pritchard*, 438 F.2d 969 (5th Cir. 1971). (D.I. 19 at 19-20) In *Pritchard*, the government sought enforcement of an IRS summons provided to the tax attorney of certain taxpayers; the summons sought, *inter alia*, the attorney's production of certain of his clients' documents. 438 F.2d at 970. The United States Court of Appeals for the Fifth Circuit upheld a district court's dismissal of the Government's petition on the ground that the Government had not made a sufficient showing as to the third *Powell* factor. *Id.* at 971. But in *Pritchard*, the decision was driven, at least in part, by the fact that neither the Government's petition nor an IRS agent's accompanying declaration had even made reference to the third *Powell* factor. *Id.*; *see also Swanson Flo-Sys., Co.*, 2011 WL 1831710, at *4 (citing *United States v. Garrett*, 571 F.2d 1323, 1328 (5th Cir. 1978)). Here, in contrast, Agent Keltner's declaration did address that factor explicitly. Moreover, in *Pritchard* it was undisputed that prior to the service of the summons, the IRS had met with the taxpayers' accountant and spent hours looking at all copies of the taxpayers' papers that were in the accountant's file. 438 F.2d at 971. So whatever the merit of the *Pritchard* decision, there it could at least be said that the IRS had previously obtained access to the documents at issue from the taxpayer through that taxpayer's representative (the taxpayers' accountant), and that the IRS was again attempting to do the same thing again (via the taxpayers' attorney). That is not the situation here. *Cf. United States v.*

13

*also Mollison v. United States*, 481 F.3d 119, 124 (2d Cir. 2007) (concluding the same); *United States v. Luther*, 481 F.2d 429, 432 (9th Cir. 1973) ("The fact that the [IRS] may have had access to [certain of the sought-after records issued or filed by the corporation with or to third parties] does not destroy the Government's right to inspect the original and primary records of the [c]orporation."); *Chen v. United States*, Case No. MC 15-0048 CJC (SSx), 2015 WL 4497751, at *5 (C.D. Cal. June 2, 2015) ("[E]ven if the IRS has some of the requested documents, or at least some version of those documents, it is nevertheless entitled to . . . compare the documents it does have with those in [the summonsed party's] possession to determine if they are consistent.") (citations omitted); *Bodensee Fund, LLC v. U.S. Dept. of Treasury-IRS*, Civil No. 07-MC-0111, 2008 WL 1930967, at *3-4 (E.D. Pa. May 2, 2008) (concluding the same). The *Sugarloaf* Court's conclusion makes good sense, especially in light of the broad investigatory power conferred by Section 7602.

Moreover, the record also allows the reasonable inference that there are responsive documents/information in DDOI's possession that have never been produced *in any form* by Artex. This could be because "Artex [] intentionally failed to produce some of those emails, inadvertently failed to do so, or simply no longer retained them at the time it complied with the summons the IRS issued to Artex." (D.I. 23 at 9; *see also id.* at 10; Tr. at 69-71) It could also be because, so far as the Court can tell, Artex produced records to the IRS in 2014, (D.I. 1 at ¶ 9 (noting that the Government obtained an order to enforce the Artex summonses in 2014); D.I. 23 at 9; Tr. at 102-04), but the Summons at issue here was served well after 2014 and covers e-mail received or sent after that year.

---

*Davis*, 636 F.2d 1028, 1038 (5th Cir. 1981) (noting that the decision in *Pritchard* should be limited to its facts).

For all of the above reasons, the record indicates that the Government has met its burden to make out a *prima facie* case as to the third *Powell* factor.  And DDOI has failed to rebut or disprove the Government's showing in that regard.  Therefore, DDOI's first argument in opposition to the Petition is not well taken.[8]

### B.   Reverse Preemption Under the MFA

The Court next turns to DDOI's second argument for dismissal.  There, DDOI raises an affirmative defense, arguing the federal law that empowers the IRS to issue and enforce the Summons (Section 7602) is subject to "reverse preemption," in light of the content of Section 6920 and the dictates of the McCarran-Ferguson Act ("MFA").  In other words, DDOI asserts that Section 6920's requirements (that prohibit DDOI from handing over to the IRS the requested information about captive insurers—unless either the affected insurers consent or the IRS agrees in writing to treat the materials confidentially)[9] trump the requirements of Section 7602 (that would otherwise permit the IRS to obtain the requested information straight away,

---

[8]      Above, the Court has largely been discussing the dispute over the third *Powell* factor in terms of the IRS' request for access to certain e-mails (i.e., Request 1).  As was noted above, in the Summons, the IRS also sought to obtain certain testimony from DDOI about the subject matter discussed therein.  The parties generally seem to agree that their arguments about access to the e-mails and access to the testimony rise and fall together.  (Tr. at 57)  That said, at one point in its briefing, DDOI seemed to suggest that the Government may somehow have forfeited its right to demand this testimony, because it had "never asked" DDOI for the testimony "at any point during the three years since the Summons was issued."  (D.I. 19 at 2)  Yet DDOI provided the Court with no legal theory to support such a conclusion.  And so, the Court has no basis to find that any type of forfeiture has occurred here.  (D.I. 23 at 20)  Therefore, if the Government's Petition is granted, the Government should have the right both to obtain the sought-after e-mails and the sought-after testimony.

[9]      Here, the IRS has declined DDOI's request that it agree in writing to treat the requested information as confidential pursuant to Section 6920.  (D.I. 19 at 2)

without the need to obtain consent from any affected insureds or to accede to Section 6920's requirements regarding confidentiality).[10]  (Tr. at 9-10)

In setting out DDOI's argument, the Court will first explain the law relating to reverse preemption under the MFA.  Thereafter, it will address the argument's substance.

### 1. McCarran-Ferguson Act

Normally, when a federal statute and a state statute conflict, the state statute yields under the doctrine of preemption.  Courts regularly apply this rule in various contexts, including in summons enforcement actions.  *See, e.g.*, *United States v. First Bank*, 737 F.2d 269, 271-75 (2d Cir. 1984).

However, the MFA is an exception to this general rule, in that it permits state laws to trump federal laws in certain circumstances (or to "reverse preempt" those laws).  The MFA was enacted in response to the Supreme Court of the United States' decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944).  *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 499 (1993).  Prior to the *South-Eastern Underwriters* decision, it had been assumed that issuing a policy of insurance was not a transaction of commerce subject to federal regulation.  *Id.* (citation omitted).  Accordingly, the states enjoyed a virtually exclusive domain over the insurance industry.  *Id.* (citation omitted).  However, in *South-Eastern Underwriters*, the Supreme Court held that an insurance company conducting a substantial portion of its business across state lines was engaged in interstate commerce and was subject to the antitrust laws.  *Id.*  Thereafter, in order to allay fears that the state's power to tax and regulate the insurance industry would be threatened, Congress enacted the MFA.  *Id.* at 499-500.

---

[10]     Federal law does otherwise provide some restrictions on the IRS' ability to disclose certain taxpayer information in its possession.  *See* 26 U.S.C. § 6103; (D.I. 23 at 6 n.3).

The MFA declares that "the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011. The most relevant portion of the MFA, in light of the nature of the parties' dispute here, is found at 15 U.S.C. §§ 1012(a)-(b) ("Section 2(a)" and "Section 2(b)" respectively), which reads as follows:

> **(a) State regulation**
>
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> **(b) Federal regulation**
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, [t]hat . . . the Sherman Act, . . . the Clayton Act[] and . . . the Federal Trade Commission Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012 (certain emphasis omitted). As can be seen above, Section 2(b) of the MFA contains "two separate clauses": a first that "deals with federal laws in general" and a second that "proscribes application of antitrust laws[.]" *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 167 n.1 (3d Cir. 2001). The first clause "was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance" and the second clause "accomplishes Congress' secondary goal [of] carv[ing] out only a narrow exemption for 'the business of insurance' from the federal antitrust laws." *Fabe*, 508 U.S. at 505.

The MFA makes states supreme as "to laws 'regulating the business of insurance[,]'" not as to "regulating all the activities of insurance companies[.]"  *SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 459 (1969) (internal quotation marks); *see also Humana Inc. v. Forsyth*, 525 U.S. 299, 308-09 (1999).  In *SEC v. Nat'l Secs., Inc.*, 393 U.S. 453 (1969) ("*National Securities*"), the Supreme Court specifically acknowledged that insurance companies would continue to do "many things" subject to federal regulation; but the Supreme Court emphasized that "only when [such companies] *are engaged in the 'business of insurance*'" does federal law potentially yield to state law.  *Nat'l Secs., Inc.*, 393 U.S. at 459-60 (emphasis added).

## 2.  Argument

The Supreme Court has explained that in a non-antitrust matter, in order to determine whether the MFA precludes application of a federal law in the face of a state law, a district court should consider three factors (factors drawn from the first clause of the MFA's Section 2(b)): (1) whether the state law is enacted "for the purpose of regulating the business of insurance"; (2) whether the federal law does not "specifically relat[e] to the business of insurance"; and (3) whether the federal law would "invalidate, impair, or supersede" the State's law.  *Humana Inc.*, 525 U.S. at 307 (internal quotation marks and citation omitted) (alteration in original); *In re Patriot Nat'l, Inc.*, 623 B.R. 696, 709 (D. Del. 2020).  The parties agree that federal jurisdiction is barred in a non-antitrust matter only if all three of these factors are satisfied.  *Highmark, Inc.*, 276 F.3d at 166; (D.I. 19 at 10; *see also* D.I. 23 at 11; DDOI's Hearing Presentation, Slide 9).

The parties disagree, however, as to another aspect of the framework for the MFA reverse preemption inquiry.  In that regard, the Government argues that before the Court applies the above-referenced three-factor test drawn from Section 2(b) of the MFA, it must first assess whether an additional, threshold element (the "threshold element") has been met:  "whether the

18

*activity complained of constitutes the 'business of insurance.'"*  *Highmark, Inc.*, 276 F.3d at 166

(quoting *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 191 (3d Cir. 1998)) (emphasis added); *see also* (D.I. 23 at 11).  If the activity complained of does not constitute the "business of insurance," the Government argues, then the reverse preemption inquiry is over and the federal law controls.  (*See* D.I. 23 at 11)  If the activity complained of does constitute the "business of insurance," only then (according to the Government) must the Court go on to assess the three factors discussed above.  (*Id.*)  For its part, DDOI disputes the Government's reading of the law in this respect.  Instead, DDOI argues that the Court should not consider this threshold element at all, because its use in a non-antitrust case is "outdated" in light of Supreme Court caselaw. (D.I. 19 at 10, 16)

Below, the Court will first address this dispute over application of the threshold element. After concluding that it should analyze the applicability of the threshold element, the Court will then go on to engage in a reverse preemption analysis.

### a.  The Court Must Assess the Applicability of the Threshold Element

After analyzing controlling case law in this Circuit, the Court concludes that the Government is correct:  i.e., that the standard for determining whether the MFA warrants reverse preemption in a non-antitrust case first requires application of the threshold element— one that asks whether the challenged conduct itself constitutes the "business of insurance."  To explain why, the Court examines relevant Supreme Court and Third Circuit caselaw regarding the MFA.

The Supreme Court first referenced the three-factor test described above in its 1993 opinion in *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 500-01 (1993).  The *Fabe* Court explained that the "starting point in a case involving construction of the McCarran-Ferguson

Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself." 508 U.S. at 500 (internal quotation marks and citation omitted). Thereafter, the *Fabe* Court quoted from the text of Section 2(b), and described the analysis required of it by referencing the three-factor test:

> Section 2(b) of the McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The parties agree that application of the federal priority statute would "invalidate, impair, or supersede" the Ohio priority scheme and that the federal priority statue does not "specifically relat[e] to the business of insurance." All that is left for us to determine, therefore, is whether the Ohio priority statute is a law enacted "for the purpose of regulating the business of insurance."

*Fabe*, 508 U.S. at 500-01 (alteration in original). In other words, in *Fabe*, the Supreme Court was focusing on what the first clause of *Section 2(b)* requires; in doing so, it noted that the words of that portion of the statute make plain that three prerequisites need be met in order for reverse preemption to apply.

A few years later, the United States Court of Appeals for the Third Circuit addressed reverse preemption and the MFA in *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185 (3d Cir. 1998). That case also involved a non-antitrust cause of action: an alleged violation of the Racketeer Influenced and Corrupt Organizations Act, or "RICO" Act. In beginning its reverse preemption analysis, the Third Circuit (as had the Supreme Court in *Fabe*), noted that "[a]s with any other issue of statutory construction, the starting point in the [MFA's] interpretation is the language of the statute itself." *Sabo*, 137 F.3d at 189 (citation omitted). Importantly, though, the *Sabo* Court first addressed the language of *Section 2(a)* of the MFA, which notes that "*[t]he business of insurance*, and every person engaged therein, shall be subject to the laws of the several States

which relate to the regulation or taxation of such business." 137 F.3d 185 at 188 (quoting 15 U.S.C. § 1012(a)) (emphasis added). The *Sabo* Court explained that "Section 2(a) of the statute, by its terms, affirmatively subjects *the business of insurance* to state regulation"; it also noted, on the other hand, that "if the contested activities are wholly unrelated to the insurance business, then the [MFA] has no place in analyzing federal regulation because *only when '[insurance companies] are engaged in the 'business of insurance' does the [MFA] apply.'"* *Sabo*, 137 F.3d at 189-90 (quoting *Nat'l Secs.*, 393 U.S. at 459-60) (emphasis added). In other words, according to the *Sabo* Court, if "the defendant's conduct does not constitute the 'business of insurance,' [pursuant to Section 2(a),] then the [MFA] simply does not apply and there is no need to confront preclusion issues under [Section ]2(b)" because "[w]e cannot imagine how [S]ection []2(b) protects a state law enacted for the purpose of regulating the insurance business when the activity in question does not relate to insurance" and that "[t]o hold otherwise would require [the Third Circuit] to abandon the structure and purpose of the [MFA]." *Id*. at 190 Lastly, the *Sabo* Court explained how, if the challenged conduct does in fact constitute the "business of insurance," then a court should address the requirements of the first clause of Section 2(b):

> If it is determined that the alleged conduct at issue broadly constitutes the "business of insurance," and is therefore subject to state regulation under [S]ection []2(a), the next issue is whether the anti-preemption mandate of [S]ection []2(b) precludes a federal cause of action. Here, the statute makes clear that a party is barred from suing under federal law if three distinct requirements are met. First, the federal law at issue does not "specifically relate" to the business of insurance. Second, the state law regulating the challenged conduct was "enacted for the purpose of regulating the business of insurance." Finally, an application of federal law would "invalidate, impair, or supersede" such state law.[] *Fabe*, 508 U.S. 501-02[.]

*Id*. (footnote omitted).

In other words, the *Sabo* Court explicitly recognized that in order to demonstrate that a federal statute is preempted by a state statute, the MFA first requires the satisfaction of the threshold element. And in doing so, the Third Circuit did not conjure this requirement from thin air—it drew it from the text of Section 2(a) of the MFA itself, which notes that only the practice of the "business of insurance" itself can possibly implicate a reverse preemption analysis.

Less than a year after *Sabo*, the Supreme Court addressed the MFA in a non-antitrust matter in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999). In *Humana*, the question at issue was whether Nevada laws regarding penalties for insurance fraud should be understood to take precedence over the RICO Act's provisions regarding private remedies (including the RICO Act's treble damages provisions). *Humana Inc.*, 525 U.S. at 304-05. In *Humana* (as in *Fabe*), the Supreme Court did not focus on the threshold element, nor apply it to the facts at hand. That was because the "question presented" in the case was focused solely on the meaning of the "invalidate, impair, or supersede" portion of Section 2(b)'s three-factor test. *Id*. at 305. The *Humana* Court went on to analyze that factor, and ultimately concluded that the MFA did not block recourse to RICO. *Id*. at 307-13.

Then in 2001, in another non-antitrust matter, the Third Circuit again had occasion to reference the test for establishing reverse preemption. In that case, *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir 2001), the question at issue was whether the MFA and a Pennsylvania state insurance law barred application of the Lanham Act. 276 F.3d at 166. The *Highmark* Court cited to *Sabo* in explaining that to "determine whether the [MFA] applies, this Court *considers the threshold question to be whether the activity complained of constitutes the 'business of insurance'*" and that, if it does, it then "look[s] to whether [Section ]2(b) precludes a federal cause of action" by applying the three-factor test from Section 2(b). *Id.* at 166 (citing

*Sabo*, 137 F.3d at 191) (emphasis added).  In applying the threshold element to that case, the

*Highmark* Court concluded that the action complained of—there, insurance advertising—did

constitute the "business of insurance."[11]  *Id.* at 166-67.  The *Highmark* Court then proceeded to

apply the three-factor test, ultimately affirming the district court's conclusion that the MFA did

not apply there.  *Id.* at 167-70.

    In sum, in a non-antitrust case like this, the Third Circuit[12] has clearly and repeatedly

instructed that the Court must first assess whether the movant has satisfied the threshold

element, before applying Section 2(b)'s three-part test.  The Supreme Court in *Fabe* and

---

[11]    During oral argument, DDOI seemed to argue that in a footnote in the *Highmark* decision ("footnote 1"), the Third Circuit suggested that the threshold element need not be evaluated in non-antitrust cases like this one.  (Tr. at 16-18; *see also* DDOI's Hearing Presentation, Slide 11)  The Court disagrees.

    Admittedly, the meaning of footnote 1 is difficult to parse.  In it, the Third Circuit acknowledges that the "Supreme Court sees a distinction between the 'business of insurance' [i.e., the type of conduct described in Section 2(a)] and laws that serve the *purpose* of regulating the business of insurance [i.e., one of the factors in the three-factor test drawn from Section 2(b)'s first clause]."  *Highmark, Inc.*, 276 F.3d at 167 n.1 (emphasis in original).  Additionally, in that footnote, the Third Circuit:  (1) references a three-pronged test (further discussed below in this Report and Recommendation) that the Supreme Court set out in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982), an antitrust case, in order to help determine what amounts to the "business of insurance"; and (2) asserts that it can sometimes be difficult to use that three-pronged test in a non-antitrust context to assess whether challenged conduct in fact amounts to the "business of insurance."  *Id.*  But the Court does not see anything in footnote 1 or elsewhere in the *Highmark* opinion to indicate that the Third Circuit believes that the threshold element does not apply to a non-antitrust MFA case.  Indeed, as noted above, in *Highmark*, the Third Circuit cited approvingly to *Sabo* for the proposition that the threshold element *did* have a place in the reverse preemption analysis in non-antitrust cases.  And the *Highmark* Court then explicitly analyzed that "threshold question[.]"  *Id.* at 166.

[12]    Our Court has only once referenced the test for analyzing a reverse preemption claim in the non-antitrust context.  However, there this Court was focused only on the applicability of the "invalidate, impair, or supersede" portion of the three-factor test drawn from Section 2(b), and it only discussed that aspect of the MFA's reverse preemption analysis.  *See In re Patriot Nat'l, Inc.*, 623 B.R. at 708-11 (reviewing a decision of the United States Bankruptcy Court for the District of Delaware and concluding that reverse preemption was not implicated).

*Humana* has not explicitly mentioned or applied this threshold element.  The Court is of course first and foremost obligated to apply the law as it is interpreted by the Supreme Court.  However, where the Supreme Court has not spoken "clearly and unambiguously on [an] issue, it is appropriate that this court, as a trial court, continue to follow the precedent of the Court of Appeals in this Circuit."[13]  *In re Jacobs*, 381 B.R. 128, 137 n.18 (E.D. Pa. 2008) (citation omitted); *see also Ruffing v. Wipro Ltd.*, CIVIL ACTION NO. 20-5545, 2021 WL 1175190, at *5 (E.D. Pa. Mar. 29, 2021).  And in the Court's view, the Supreme Court has not spoken "clearly and ambiguously" in *Fabe* or *Humana* as to whether Section 2(a) of the MFA provides a separate, independent barrier that a party must overcome in order to establish reverse preemption in a non-antitrust case.  After all, it could be that the reason why the Supreme Court did not reference the threshold element in those two cases is simply because no party raised the issue, or because the applicability of the element was not in controversy.[14]  Therefore, the Court will follow controlling Third Circuit precedent on this point, and will first address whether the challenged conduct at issue constitutes the "business of insurance."  *See Ins. Prods. Mktg., Inc. v. Conseco Life Ins. Co.*, Civil Action No. 9:11-cv-01269-PMD, 2011 WL 3841269, at *4

---

[13]      It is not as if the Third Circuit in *Sabo* or *Highmark* overlooked the fact of the Supreme Court's decisions in *Fabe* and *Humana*.  To the contrary, in setting out the appropriate reverse preemption analysis, the *Sabo* Court cited repeatedly to *Fabe*, *see Sabo*, 137 F.3d at 189 & n.1, 191 n.3, and the *Highmark* Court cited to both *Fabe* and *Humana*, *see Highmark, Inc.*, 276 F.3d at 167-68 & n.1.

[14]      Moreover, the conclusion that the threshold element applies here does gibe with what the Supreme Court previously said in *National Securities*:  that pursuant to the MFA, only when an insurance company is actually "engaged in the 'business of insurance'" does federal law yield to state law.  *Nat'l Secs., Inc.*, 393 U.S. at 459-60; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427-28 (2003) ("The provisions of the [MFA] said to be relevant here specify that '[t]he business of insurance' shall be recognized as a subject of state regulation, 15 U.S.C. § 1012(a), which will be good against preemption by federal legislation unless that legislation 'specifically relates to the business of insurance,' § 1012(b)[.]") (alteration in original).

24

(D.S.C. Aug. 29, 2011) (listing the threshold element of Section 2(a) along with the three-factor test of Section 2(b) as amounting to the controlling standard for MFA reserve preemption review in a non-antitrust context) (quoting *Highmark, Inc.*, 276 F.3d at 166); *Coleman v. Commonwealth Land Title Ins. Co.*, Civil Action No. 09-679, 2010 WL 2545539, at *3 (E.D. Pa. June 18, 2010) (same); *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2006 WL 2850607, at *14 n.13 (D.N.J. Oct. 3, 2006) (same).

### b. Does the Challenged Conduct Constitute the "Business of Insurance"?

In assessing whether the challenged conduct at issue constitutes the "business of insurance," the Court must first articulate what exactly that challenged conduct *is* (and where the Court should look to identify it). On that score, the Court turns to the particular state statute in question, which is Section 6920.[15] And when examining the words of that statute, and the kind of conduct it regulates, it becomes clear (as the Government argues) that the conduct at issue therein is fairly characterized as "[r]ecord maintenance" or "the dissemination and maintenance of information, documents, and communications [maintained by the state.]" (D.I. 23 at 12-13 (emphasis omitted, internal quotation marks and citation omitted) (alteration in original); *see also* Tr. at 66) Section 6920 expressly forbids DDOI from disclosing to any other person, *inter alia*, "[a]ll portions of license applications reasonably designated confidential by [a captive insurer, or] all information and documents . . . produced or obtained by or submitted or

---

15 As the Government notes, when the Supreme Court has analyzed reverse preemption questions pursuant to the MFA, it has examined "discrete statutes, not comprehensive statutory schemes." (D.I. 23 at 18); *see Fabe*, 508 U.S. at 493 (analyzing Ohio Rev. Code Ann. § 3903.42 (1989)); *Nat'l Secs.*, 393 U.S. at 462 (analyzing Ariz. Rev. Stat. Ann. § 20-731(B) (Supp. 1969)). So, the right place to focus here is on Section 6920 in particular, not on the entire Delaware Captive Law in general. (D.I. 23 at 18) Both parties agree that this is the correct approach. (*See* Tr. at 37)

disclosed to [DDOI] pursuant to subchapter III of this chapter of this title that are reasonably designated confidential" by a captive insurer, as well as various documents the insurer provides to DDOI "that are related to an examination pursuant to this chapter"—all unless the insurer provides "prior written consent[.]" DEL. CODE ANN. tit. 18, § 6920 (2007). The statue also carves out two exceptions to this edict. One of those states that DDOI may provide this information to the insurance department of any state or any country or jurisdiction other than the United States of America. *Id.* And the other exception (the one at issue here) allows DDOI to provide such material to "a law-enforcement official or agency of [Delaware], any other state or the United States of America" but only "so long as such official or agency agrees in writing to hold it confidential and in a manner consistent with this section." *Id.* From the statute's text, then, one can see that its entire focus is on the type of access that DDOI may or may not provide to third parties (including federal law enforcement officers) regarding a captive insurer's confidential information.

With the challenged conduct defined, the Court next asks "Does this conduct amount to the 'business of insurance?'" The Supreme Court has provided significant guidance to help lower courts answer this question. A review of that guidance makes clear that the correct answer is "No."

The Court first turns to three criteria that the Supreme Court has deemed relevant in determining whether a particular practice is part of the "business of insurance": (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured"; and

(3) "whether the practice is limited to entities within the insurance industry."[16] *Sabo*, 137 F.3d at 191 (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211-21 (1979)); *see also In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607, at *8 (assessing these three criteria as part of the court's analysis as to whether challenged conduct in a non-antitrust case amounted to the "business of insurance"). "None of these criteria is necessarily determinative in itself[.]" *Pireno*, 458 U.S. at 129. When one looks at these three criteria, it is pretty clear that two of them (the first and second criteria) favor the Government's position. With regard to the first criterion, the conduct at issue in Section 6920 has nothing to do with "the effect of transferring or spreading a policyholder's risk." And with regard to the second criterion, the challenged conduct is not "an integral part of the policy relationship between the insurer and the insured." That said, the third criterion ("whether the practice is limited to entities within the insurance industry") can be read to favor DDOI, in the sense that Section 6920 only relates to DDOI's disclosure responsibilities regarding the confidential information of *captive insurers* (and does not relate to the protection of the confidential information of entities involved in *other industries*, such as banking, or health care, or the like).[17] But overall, the majority of these criteria suggest that the conduct at

---

[16]    While these three "business of insurance" criteria were originally applied to an analysis of the applicability of the second antitrust clause in Section 2(b), the Third Circuit has made it clear that they "may nevertheless provide guidance in a more generalized analysis under th[e MFA]"; in doing so, the Third Circuit categorically rejected the suggestion that these criteria are "simply not relevant in determining what constitutes the business of insurance in a non-antitrust context." *Sabo*, 127 F.3d at 191 & n.3 (noting, however, that the "test is only a starting point in the analysis for non-antitrust cases") (citing *Fabe*, 508 U.S. at 503-05).

[17]    In arguing that this third criterion should actually favor its position, the Government in its briefing pointed to several other Delaware statutes that require governmental or private bodies in other fields of industry to keep confidential certain information disclosed to those bodies. (*See* D.I. 23 at 14 n.10) The Government's argument seemed to be that when you consider Delaware law as a whole, "the practice" of safeguarding confidential records is not in

issue is not the "business of insurance." *Cf. F.T.C. v. Mfrs. Hanover Consumer Servs., Inc.*, 567 F. Supp. 992, 996 (E.D. Pa. 1983) (applying the three criteria and concluding that the challenged practice, which related to the sale of credit insurance, did not amount to the "business of insurance," where two of the criteria suggested that outcome while the remaining criterion could be "viewed either way").

The Court is mindful that the three above-referenced criteria are merely the "starting point in the analysis" for its "business of insurance" inquiry. *Sabo*, 137 F.3d at 191 & n.3. But when the Court goes a step further and assesses how the Supreme Court described what is the "business of insurance" in *National Securities*, the Government's position seems even stronger. In *National Securities*, the Supreme Court explained:

> Certainly the fixing of rates is part of [the "business of insurance"] . . . [t]he selling and advertising of policies . . . and the licensing of companies and their agents . . . are also within the

---

fact "limited to entities within the insurance industry." But that cannot be the right way to assess this criterion. Instead, the Court agrees with DDOI that when this third criterion asks "whether *the practice* is limited to entities within the insurance industry," it is focused on "the practice" (i.e., the conduct) that is addressed by the "specific statute" at issue here (Section 6920), not by Delaware law as a whole. (D.I. 25 at 5) Indeed, during oral argument, Government's counsel acknowledged that this view amounts to a "fair criticism" of the Government's position. (Tr. at 94)

Thereafter at oral argument, the Government put forward a different position about why this factor redounds in its favor—one it did not proffer in its briefing. There the Government argued that because Section 6920 is focused on what *DDOI* (a government entity that purportedly is *not itself involved in the insurance business*) may or may not do with certain records, then "the practice" at issue in the statute is not "limited to entities within the insurance industry." (Tr. at 94-95) Whatever the merit of this argument, because the Government did not put it forward in its briefing, it is waived. *See Horatio Wash. Depot Techs. LLC v. TOLMAR, Inc.*, Civil Action No. 17-1086-LPS, 2018 WL 5669168, at *7 n.4 (D. Del. Nov. 1, 2018) (holding that a new argument presented at oral argument was waived where it "was not fairly presented in [the] briefing[]") (citing cases), *report and recommendation adopted*, 2019 WL 1276028 (D. Del. Mar. 20, 2019); *cf. Tomasko v. Ira H. Weinstock, P.C.*, 357 F. App'x. 472, 479 (3d Cir. 2009) (holding that arguments raised for the first time at oral argument in the district court were waived because that method of proceeding could "deprive one's opponent of any meaningful opportunity to respond").

28

> scope of the statute.  Congress was concerned with the type of
> state regulation that centers around the contract of insurance . . . .
> The relationship between insurer and insured, the type of policy
> which could be issued, its reliability, interpretation, and
> enforcement—these were the core of the "business of insurance."
> Undoubtedly, other activities of insurance companies relate so
> closely to their status as reliable insurers that they to[o] must be
> placed in the same class.  But whatever the exact scope of the
> statutory term, it is clear where the focus was—it was on the
> relationship between the insurance company and the policyholder.
> Statutes aimed at protecting or regulating this relationship,
> directly or indirectly[,] are laws regulating the "business of
> insurance."

*Nat'l Secs.*, 393 U.S. at 460 (citations omitted); *see also In re Ins. Brokerage Antitrust Litig*.,

2006 WL 2850607, at *8 (using *National Securities*' description of the "business of insurance"

as another method of investigating whether challenged conduct in a non-antitrust case amounted

to the "business of insurance").  Obviously, Section 6920 does not deal with the fixing of

insurance rates, nor the selling and advertising of insurance policies, nor the type of insurance

policy a company can issue, nor anything about such a policy's reliability, interpretation or

enforcement.  Relatedly, the statue does not appear to be about the "relationship between insurer

and insured" or the "relationship between the insurance company and the policyholder."[18]

Fundamentally, Section 6920 does not deal with the substance of how an insurance company

treats or interacts with its insureds; it has to do with how a government agency treats documents

---

[18]    Indeed, at times, DDOI's briefing seemed to underscore this reality.  At one
point in its briefing, DDOI wrote:  "Maintaining confidentiality is important while sharing
information because *both regulators and insurance companies* have an interest in ensuring
confidentiality."  (D.I. 19 at 12 (emphasis added); *see also* D.I. 23 at 18)  At another point,
DDOI suggested that Section 6920 was important because it helped support a "reciprocal policy
among *state insurance commissioners and state and federal agencies*, allowing the sharing of
information, so long as it is held confidential."  (D.I. 19 at 12 (emphasis added); *see also* D.I. 23
at 18-19)  Again, however, a statute directed to the "business of insurance" is one focused on
the relationship *between the insurer and the insured*, not the relationship between the insurer
and an insurance regulator, or the relationship between insurance regulators and other
investigative or regulatory agencies.  (*See also* Tr. at 33-35)

that an insurance company provides to it.  In other words, it is not about the relationship

between the insurer and the insured; it is about the relationship between the insurer and its

regulator, or the relationship between the regulator and other insurance regulators or

investigatory agencies.[19]  (D.I. 23 at 17); *cf. Royal Drug Co.*, 440 U.S. at 216 (concluding that

certain pharmacy agreements did not amount to the "business of insurance," in part, because

they were "not 'between insurer and insured[]' . . . [and instead were] separate contractual

arrangements between [an insurer] and pharmacies engaged in the sale and distribution of goods

and services other than insurance").

Now, one could really stretch the meaning and import of Section 6920's text and argue

that (as DDOI does) the statue is actually about the "licensing" of insurance companies.  (D.I.

19 at 11-12)  It is true, for example, that the statute regulates how DDOI should protect

confidential information that is *obtained through the insurance licensing process*.  Moreover, if

DDOI shares confidential documents about an entity with another state insurance regulator, for

example, the shared documents might end up having a bearing on *whether that entity is*

*ultimately licensed by the other regulator*.  (D.I. 25 at 7)  Yet to view the gravamen of Section

6920 as being about the "licensing" of insurance companies is to take an unduly broad view of

the statute's text.  *Cf. Royal Drug Co.*, 440 U.S. at 216-17 (cautioning courts not to analyze the

---

[19]    Of course, a captive insurance company is an unusual entity, in the sense that the
insurer is a company that issues insurance to its parent company or affiliate.  (D.I. 19 at 12-13;
D.I. 23 at 5; D.I. 25 at 6)  And so the "relationship" between the insurer and the insured in a
captive insurance context is a bit different than what that relationship would look like in a more
"traditional" insurer/insured scenario (i.e., where the insurer insures otherwise unaffiliated third
parties).  But despite DDOI's suggestion otherwise, (D.I. 19 at 12-13; D.I. 25 at 6), the Court
does not see how the unusual nature of a captive insurance company's makeup renders Section
6920 any more directed to the "business of insurance."  If Section 6920 only applied to those
more traditional insurers, the challenged conduct addressed by the statute would still be the
same.

term "business of insurance" in an unduly "broad" manner, because doing so could turn "almost every business decision of an insurance company" into the "business of insurance" in a manner that is contrary to the MFA's language, as the statute exempts only the "business of insurance" and not the "business of insurance companies") (internal quotation marks omitted); *Mfrs. Hanover Consumer Servs., Inc.*, 567 F. Supp. at 996 (concluding that "if the practice sought to be investigated is characterized as the business of insurance because insurance is somehow involved, the insurance industry would be able to expand its [MFA] protection" in unwarranted ways); (Tr. at 28-29).  After all, the *core* conduct regulated by Section 6920 does not have to do with the licensing process.  Section 6920 does not speak to the criteria for licensing captive insurance companies, nor to the process by which a captive insurance company can obtain a license.[20]  Instead, it speaks to how confidential documents that were submitted during the licensing process are to be maintained and protected.  For all of these reasons, the additional direction provided by the Supreme Court in *National Securities* also supports the conclusion that Section 6920 does not relate to the "business of insurance."

Also supporting the Court's conclusion here is the decision in a similar case from the United States District Court for the District of New Jersey:  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, Civil Action No. 12-5275, 2015 WL 1969368 (D.N.J. Apr. 30, 2015).  In *City of Sterling Heights*, a securities class-action case, the lead plaintiffs alleged that defendant Prudential Financial, Inc. ("Prudential") had failed to account for certain life insurance policies in its reserves, which in turn led Prudential to later announce a $139

---

[20]    The Delaware Captive Law deals with such licensing issues in other portions of its statutory scheme.  (Tr. at 84-85 (Government's counsel noting that "if [Section] 6920 were repealed tomorrow, the ability of an insurer to be licensed and to apply for a license in Delaware would be unchanged"))

million charge to its earnings. 2015 WL 1969368, at *1. The lead plaintiffs claimed that Prudential's and certain of its officers' false or misleading statements about the policies had ultimately caused Prudential's stock price to fall. *Id.* During the case, non-party Verus Financial LLC ("Verus")—an entity that had conducted an examination and audit of Prudential's practices, and that was in close contact with Prudential and state insurance regulators in doing so—appealed a United State Magistrate Judge's order; the order compelled Verus to, *inter alia*, produce documents and communications subpoenaed by the lead plaintiffs. *Id.* at *1-2 & n.1. In appealing the order to the district court, Verus pointed to certain state anti-disclosure statutes that provided for the confidentiality of information gathered during an insurance examination. These statutes are undisputedly very similar to Section 6920, in that they "generally provide that examination-related materials are 'not subject to subpoena[.]'" *Id.* at *6. Verus argued that these state statues and the MFA preempted Federal Rule of Civil Procedure 45 (which would otherwise have permitted the lead plaintiffs to subpoena such documents) and Federal Rule of Evidence 501 (which the Court had construed not to recognize a common law insurance examination privilege). *Id.* at *4, *6.

The *City of Sterling Heights* Court ultimately concluded that the MFA and these state insurance laws did not reverse preempt Rule 45 or Rule 501. In doing so, the district court explained (similar to the Court's conclusion above) that "the activity in question that the [state] anti-disclosure statutes seek to regulate is the dissemination and maintenance of information, documents, and communications developed as a result of an insurance examination." *Id.* at *6. The Court then applied the threshold element of Section 2(a) and concluded that the activity in question there did not amount to the "business of insurance" because it "has nothing at all to do

with the insurer-insured relationship, nor does it have the effect of spreading a policyholder's risk."[21]  *Id.*

DDOI argues that the Court should disregard the *City of Sterling Heights* decision for various reasons.  (D.I. 19 at 16-18; DDOI's Hearing Presentation, Slides 24-26)  None are persuasive.

For example, DDOI argues that the "business of insurance" portion of the decision in *City of Sterling Heights* amounts only to "dicta[,]" because in that case, the Controller of the State of California ("Controller") (an entity in a similar position to DDOI here) only intervened for the purpose of asserting certain privilege rights that were unrelated to an MFA reverse preemption argument.  (D.I. 19 at 17)  DDOI claims that the "the matter may have been determined differently" had the Controller actually raised a reverse preemption objection.  (*Id.*) But it appears that in *City of Sterling Heights*, the Controller and other insurance regulators *did* argue that MFA preemption applied, and the district court simply disagreed with that position. (D.I. 23 at 15 (citation omitted))  Moreover, the district court's decision on the "business of insurance" issue was certainly not dicta; it was central to the resolution of the appeal in question.  (*Id.*)  DDOI next argues that the *City of Sterling Heights* Court made a legal error in applying Section 2(a)'s threshold element in the first place.  (D.I. 19 at 17-18)  But as the Court has explained above, applying that threshold element was entirely proper, in light of binding Third Circuit precedent.  Lastly, DDOI suggests that the *City of Sterling Heights* Court should have considered other factors before coming to its conclusion as to whether the challenged conduct amounted to the "business of insurance."  (*Id.* at 18)  But DDOI never says what other

---

[21]     The *City of Sterling Heights* Court also went on to conclude, pursuant to one of the three factors relating to an analysis under the first clause of Section 2(b), that the purpose of the state statutes in question was not to regulate the business of insurance.  *Id.*

factors the *City of Sterling Heights* Court should have considered, or why it would have made a difference. In the end, the decision in *City of Sterling Heights* was on point, it was correct and it thus provides support for the Court's decision here.

Therefore, having determined that the challenged conduct at issue does not constitute the "business of insurance," the Court declines to apply the MFA to Section 6920.[22] As such, the Court recommends that the Government's Petition be granted.[23]

## III. CONCLUSION

For the foregoing reasons, the Court recommends that DDOI's Motion be DENIED and that the Government's Petition be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

---

[22] Because the Court has declined to find that reverse preemption is applicable here, in light of its conclusion that the challenged conduct does not constitute the "business of insurance," it will not address the parties' arguments as to the three factors drawn from the first clause of Section 2(b) of the MFA.

[23] In light of the Court's decision on the Petition, it sees no merit to DDOI's request that the Court issue a protective order. (*See* D.I. 19 at 20; DDOI's Hearing Presentation, Slides 36-37) The Court therefore denies that request. (D.I. 24 at 3-6)

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  July 16, 2021

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE