IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-829 (MN) (CJB) |
| | ) | |
| DELAWARE DEPARTMENT OF | ) | |
| INSURANCE, | ) | |
| | ) | |
| Respondent. | ) | |

### <u>MEMORANDUM OPINION</u>

David A. Hubbert, Acting Assistant Attorney General, David C. Weiss, United States Attorney, Ward W. Benson, Kyle L. Bishop, Trial Attorneys, Tax Division, U.S. Department of Justice, Washington, DC – Attorneys for United States of America

Kathleen P. Makowski, Deputy Attorney General, State of Delaware Department of Justice; Willington, DE; Patricia A. Davis, Deputy State Solicitor, State of Delaware Department of Justice, Dover, DE; James J. Black, III, Jeffrey B. Miceli, Mark W. Drasnin, Black & Gerngross, P.C., Philadelphia, PA – Attorneys for Delaware Department of Insurance

September 29, 2021
Wilmington, DE

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE:**

Presently before the Court are the objections (D.I. 29) of Respondent Delaware Department of Insurance ("DDOI" or "Respondent") to Magistrate Judge Burke's July 16, 2021 Report and Recommendation (D.I. 28) ("the Report").   The Report recommended (1) granting a petition ("the Petition") brought by Petitioner United States of America ("the Government" or "Petitioner") to enforce an Internal Revenue Service ("IRS") summons ("the Summons") and (2) denying DDOI's corresponding motion to quash the summons ("the Motion") (D.I. 16).   The Court has reviewed the Report (D.I. 28), Respondent's objections (D.I. 29) and Petitioner's response thereto (D.I. 33), and the Court has considered *de novo* the objected-to portions of the Report, the relevant portions of the Petition and supporting documentation (D.I. 1, 3 & 5), as well as the Motion and the responses and replies thereto (D.I. 16, 17, 18, 19, 24 & 25).   The Court has also afforded reasoned consideration to any unobjected-to portions of the Report.[1]   *EEOC v. City of Long Branch*, 866 F.3d 93, 99-100 (3d Cir. 2017).   For the reasons set forth below, Respondent's objections are OVERRULED, the Report is ADOPTED, the Petition (D.I. 1) is GRANTED and the Motion (D.I. 16) is DENIED.

## I.    BACKGROUND

The Report sets forth a detailed description of the factual and procedural background underlying the Petition (and the Motion).   (*See* D.I. 28 at 1-6).   The parties have not objected to

---

[1]    DDOI does not object to the Report's recommendation (D.I. 28 at 7 n.5) that the Court deny the motion to quash because DDOI failed to meet the requirements of Internal Revenue Code regulations regarding who may seek to quash a petition.   Similarly, DDOI does not object to the Report's rejection (D.I. 28 at 10-15) of its argument that the information sought was already in the possession of the IRS.   Finding no clear error on the face of the record, this Court adopts the Report as to those issues.

any of those sections of the Report and the Court finds no error in those sections.  The Court therefore adopts those sections and incorporates them here:

### A.      Factual Background

The facts underlying this dispute involve the IRS' investigation of the role of certain entities that have been involved in transactions related to micro-captive insurance companies. (D.I. 1 at ¶¶ 4-5) DDOI has issued insurance certificates to these insurance companies. (Id. at ¶ 8) Below, the Court will first discuss facts relevant to captive insurance companies, and then it will discuss facts related to the Summons giving rise to the instant dispute.

### 1.      Captive Insurance Companies and Relevant Provisions of the Delaware Insurance Code

A captive insurance company (or "captive insurer") is an insurance company that is wholly owned and controlled by its insureds.  (D.I. 17 at ¶ 11)  Its primary purpose is to insure the risks of its owners, who in turn benefit from the captive's insurer's underwriting profits.  (Id.)  Business entities that are experienced in establishing and managing captive insurance companies are called "Captive Managers"; these Captive Managers facilitate the creation, formation and management of captive insurers in certain jurisdictions that have passed captive insurance legislation, like Delaware.  (Id. at ¶ 14)

Chapter 69 of the Delaware Insurance Code, also known as "Delaware Captive Law," is a part of the state statutory scheme that governs the formation, licensing and regulation of captive insurers.  (Id. at ¶ 9)  Under Chapter 69, a captive insurer can be formed and structured in a number of ways.  (Id. at ¶ 12)  Relevant to this case are "micro-captive" insurers, which are small captive insurance companies that are taxed under Section 831(b) of the United States Tax Code.  (Id. at ¶¶ 12-13)  Section 831(b) permits micro-captive insurers to be taxed not on underwriting income, but on investment income at or below a certain threshold for that tax year. 26 U.S.C. § 831(b).  This tax treatment can be favorable to micro-captive insurers.

Section 6920 of the Delaware Insurance Code ("Section 6920") relates to the confidential treatment of materials and information that captive insurers submit to the state tax commissioner, either directly or through DDOI, as part of the

application and licensing process.  (D.I. 17 at ¶ 20)  Section 6920 reads as follows:

> All portions of license applications reasonably designated confidential by or on behalf of an applicant captive insurance company, all information and documents, and any copies of the foregoing, produced or obtained by or submitted or disclosed to the Commissioner pursuant to subchapter III of this chapter of this title that are reasonably designated confidential by or on behalf of a special purpose financial captive insurance company, and all examination reports, preliminary examination reports, working papers, recorded information, other documents, and any copies of any of the foregoing, produced or obtained by or submitted or disclosed to the Commissioner that are related to an examination pursuant to this chapter must, unless the prior written consent (which may be given on a case-by-case basis) of the captive insurance company to which it pertains has been obtained, be given confidential treatment, are not subject to subpoena, may not be made public by the Commissioner, and may not be provided or disclosed to any other person at any time except:
>
> (1) To the insurance department of any state or of any country or jurisdiction other than the United States of America; or
>
> (2) To a law-enforcement official or agency of this State, any other state or the United States of America so long as such official or agency agrees in writing to hold it confidential and in a manner consistent with this section.

DEL. CODE ANN. tit. 18, § 6920 (2007).

## 2.  IRS Summons and Subsequent Events

The facts giving rise to this dispute arose from an IRS investigation of the role of nonparties Artex Risk Solutions, Inc. ("Artex"), Tribeca Strategic Advisors, LLC ("Tribeca") (which is owned by Artex) and others, in transactions involving micro-captive insurance plans.  (D.I. 1 at ¶¶ 4-5; D.I. 3 at ¶ 3)  The IRS was investigating, *inter alia*, whether Artex or Tribeca violated federal laws by promoting micro-captive insurance schemes.  (D.I. 1 at ¶ 5; D.I. 3 at ¶ 4)  The IRS has designated such micro-captive insurance schemes (*e.g.*, schemes in which the taxpayer inappropriately seeks to shield income from taxation through the use of sham insurance companies) as a "Transaction of Interest," and both the IRS and the

United States Tax Court have found that the schemes can be used to avoid or evade taxes.[2]  (D.I. 1 at ¶ 6 (citing I.R.S. Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016)))  As part of the Artex investigation, in December 2013, the IRS issued two administrative summonses to Artex.  *United States v. Artex Risk Sols., Inc.*, No. 14 C 4081, 2014 WL 4493435, at *1 (N.D. Ill. Sept. 11, 2014) (cited in D.I. 1 at ¶ 9).  Artex ultimately produced certain documents pursuant to these summonses, including certain e-mail correspondence between Artex and DDOI.  (D.I. 1 at ¶¶ 9-11; D.I. 3 at ¶ 5)

On October 30, 2017, the IRS issued to DDOI the Summons at issue here; the Summons seeks information pertaining to approximately 200 insurance certificates of authority that DDOI issued to micro-captive insurance companies associated with Artex and Tribeca.[3]  (D.I. 1 at ¶¶ 4, 8, 14; D.I. 3 at ¶¶ 6, 16; D.I. 5)  The Summons included a request for testimony and four requests for records; the first such records request ("Request 1") asked that DDOI "[p]rovide all electronic mail between [DDOI] and Artex and/or Tribeca related to the Captive Insurance Program[.]"  (D.I. 5 at 1, 17; *see also* D.I. 19 at 5)

On November 28, 2017, DDOI issued to the IRS its objections and responses to the Summons, including confidentiality objections brought pursuant to Section 6920.  (D.I. 19 at 5)  On the same date, DDOI also produced approximately 169 documents to the IRS, and on April 30, 2018, DDOI produced an additional approximately 125 pages of documents.  (D.I. 1 at ¶¶ 17-18; D.I. 3 at ¶¶ 10-11)  None of these additional documents included any e-mails.  (D.I. 1 at ¶ 18; D.I. 3 at ¶ 11)  Thereafter, counsel for the Government and the DDOI had further discussions, in which the Government sought to obtain DDOI's voluntary compliance with Request 1.  (D.I. 1 at ¶ 19)  As a result of those discussions, DDOI

---

[2]   Artex and Tribeca have also been sued by 49 plaintiffs seeking to bring a class action lawsuit alleging damages "sustained in connection with . . . micro-captive insurance strategies that [Artex and Tribeca] 'designed, developed, promoted, sold, implemented[] and managed[.]'"  (D.I. 1 at ¶ 7 (citation omitted))  Those plaintiffs sought compensation for damages arising from micro-captive insurance strategies that they entered into and utilized on their federal and state tax returns, on the advice of Artex and Tribeca, from 2005 onwards.  (*Id.*)

[3]   In its filings, the Government asserted that DDOI has issued approximately 191 insurance certificates of authority to micro-captive insurance companies associated with Artex.  (D.I. 1 at ¶ 8; D.I. 3 at ¶ 6)  In its briefing, DDOI states that it has licensed 225 captive insurance companies managed by Artex, of which 210 are micro-captives, with only 68 of those being currently active.  (D.I. 19 at 5)

agreed to produce documents on a rolling basis that DDOI believed were responsive to the subpoena but that were not client-specific. (*Id.*)  Between 2018-2019, DDOI produced approximately 1,591 pages of such documents; DDOI represents that these constitute all non-client specific documents in its possession, custody or control that are responsive to Request 1.  (*Id.*; D.I. 3 at ¶ 12; *see also* D.I. 19 at 5-6)

As for the client-specific documents in DDOI's possession responsive to Request 1, DDOI refused to produce those to the IRS. Instead, in October 2019 and again in February 2020, DDOI sent communications to all of the micro-captive insurance companies associated with Artex; in these communications, DDOI asked the companies to voluntarily consent to DDOI's release of the documents to the IRS.  (D.I. 1 at ¶ 20; D.I. 3 at ¶ 13)  In total, only 19 of the affected micro-captive insurance companies consented to such production, and DDOI later produced to the IRS responsive files (totaling over 1,800 pages) for those entities.[4]  (D.I. 1 at ¶ 20; D.I. 3 at ¶ 13; *see also* D.I. 19 at 6-7 & n.3)

At present, then, DDOI has not produced documents responsive to Request 1 that are client-specific and relate to micro-captive insurance companies that have not consented to the production.  (D.I. 1 at ¶¶ 9, 12, 16; D.I. 3 at ¶ 15; *see also* D.I. 5, exs. 3-4)  DDOI also has not provided the testimony demanded by the IRS in the Summons.  (D.I. 1 at ¶ 16; D.I. 3 at ¶ 9)  With the instant Petition, the Government seeks these outstanding documents and testimony.  (D.I. 1 at ¶ 26) . . .

## B.    Procedural Background

The Government filed the Petition on June 19, 2020, along with a supporting declaration authored by IRS Revenue Agent Bradley Keltner (the "Keltner Declaration").  (D.I. 1; D.I. 3)  On October 15, 2020, [the undersigned judge] referred this case to [Magistrate Judge Burke] to hear and resolve all pre-trial matters up to and including expert discovery matters. (D.I. 6)

On January 11, 2021, [Judge Burke] entered an Order to Show Cause directing DDOI to submit its defense or opposition to the Petition; [he] also set a show cause hearing for

---

[4]    In its Petition, the Government alleged that DDOI had produced such records for 16 micro-captive insurance companies.  (*See* D.I. 1 at ¶¶ 8, 20; D.I. 3 at ¶ 13)  In its briefing, DDOI contended that the correct number was 19, as it has subsequently produced three more company-specific files after receiving the relevant consents.  (D.I. 19 at 6-7 & n.3)

> February 22, 2021.  (D.I. 8)  On February 8, 2021, DDOI filed its
> opposition to the Petition, (D.I. 15), and on the same day, DDOI also
> filed the instant Motion, (D.I. 16)  Because briefing on the Motion
> would not have been completed prior to the scheduled February
> 22nd hearing, [Judge Burke] rescheduled a hearing on the Petition
> and the Motion for March 12, 2021. (D.I. 22)  On February 24, 2021,
> briefing was completed on the Petition, (D.I. 23), and on
> March 3, 2021, briefing was completed on the Motion, (D.I. 25).  On
> March 12, 2021, [Judge Burke] held the hearing and heard argument
> on the Petition and the Motion.  (Docket Item, March 12, 2021
> (hereinafter, "Tr.")).

(D.I. 28 at 1-6 (emphases and some alterations in original)).

On July 16, 2021, Judge Burke issued the Report recommending that the Petition be granted and the corresponding Motion be denied.  (D.I. 28).  DDOI timely objected to select portions of the Report (D.I. 29) and the Government responded (D.I. 33).

## II.   LEGAL STANDARDS

### A.   Review of Reports and Recommendations

The power vested in a federal magistrate judge varies depending on whether the issue to be decided is dispositive or non-dispositive.  "Unlike a nondispositive motion (such as a discovery motion), a motion is dispositive if a decision on the motion would effectively determine a claim or defense of a party."  *City of Long Branch*, 866 F.3d at 98-99 (citations omitted).  For reports and recommendations issued for dispositive motions,[5] "a party may serve and file specific written objections to the proposed findings and recommendations" within fourteen days of the recommended disposition issuing and "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  FED. R. CIV. P. 72(b)(2)-(3);

---

[5]   Judge Burke issued the Report pursuant to 28 U.S.C. § 636(b)(1)(B), noting that courts generally have found that petitions to enforce IRS summonses should be considered dispositive motions.  (*See* D.I. 28 at 34; *see also id.* at 1 n.1).  Neither party argues that the Government's Petition should have been considered a nondispositive motion and subject to § 636(b)(1)(A).  And this Court also agrees that a Report and Recommendation under § 636(b)(1)(B) was the appropriate procedure here.

*see also* 28 U.S.C. §§ 636(b)(1)(B)-(C); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).  When no timely objection is filed (including as to select portions of the report), "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."   FED. R. CIV. P. 72(b) advisory committee notes to 1983 amendment. "[B]ecause a district court must take some action for a report and recommendation to become a final order and because '[t]he authority and the responsibility to make an informed, final determination . . . remains with the judge," however, district courts are still obligated to apply "reasoned consideration" in such situations.  *City of Long Branch*, 866 F.3d at 99-100 (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976); *see also Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987)).

      **B.**        **McCarran-Ferguson Act**

As a general rule, when a federal statute and a state statute conflict, the state statute yields under the doctrine of preemption.  Courts regularly apply this rule in various contexts, including in summons enforcement actions. *See, e.g.*, *United States v. First Bank*, 737 F.2d 269, 271-75 (2d Cir. 1984).  The McCarran-Ferguson Act ("MFA") creates an exception to this general rule. The MFA provides, in pertinent part:

    **(a) State regulation**

    The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

    **(b) Federal regulation**

    No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: . . .

15 U.S.C. § 1012.  In enacting the MFA, "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies."  *S.E.C. v. Nat'l Sec., Inc.*, 393 U.S. 453, 458-59 (1969) (citing 91 Cong. Rec. 1087-1088).  The MFA attempted "to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation."  *Nat'l Sec.*, 393 U.S. at 459.  It did not "purport to make the States supreme in regulating all the activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the business of insurance.'  Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the [MFA] apply."  *Id.* at 459-60.

## III.   <u>DISCUSSION</u>

As set forth above, the Report rejected DDOI's argument that dismissal of the Petition was warranted based on reverse preemption, which would mean that Delaware law (Section 6290) applies and prohibits DDOI from disclosing to the IRS the requested confidential information about captive insurers (without consent or confidentiality protections).  (*See* D.I. 28 at 15-34).  Underlying the Report's rejection of this argument was the conclusion that the MFA does not permit reverse preemption here because it simply does not apply – *i.e.*, the MFA only allows for reverse preemption when the conduct at issue is the "business of insurance," which was found missing here.  (*Id.* at 25-34).  On this point, DDOI argues that the Report erred in two ways:  (1) by applying a "threshold test" of whether the conduct at issue constitutes the business of insurance for a non-antitrust case; and (2) by determining that the challenged conduct does not constitute the "business of insurance."   DDOI also argues that the Report erred by failing to recommend

dismissal of the Petition on the grounds that the MFA reverse-preempted the Summons.  The Court

will address each objection in turn.

A.   **Application of a "Threshold Test"**

DDOI asserts that the Report "committed an error of law by requiring a 'threshold'

determination:  whether the challenged conduct constitutes the 'business of insurance,' in a non-

antitrust case."  (D.I. 29 at 2).  More specifically, DDOI objects on the grounds that the Report's

application of the Third Circuit's threshold framework in *Highmark, Inc. v. UPMC Health Plan,*

*Inc.*, 276 F.3d 160, 166 (3d Cir. 2001), was inconsistent with the Supreme Court's decisions in

*Humana Inc. v. Forsyth*, 525 U.S. 299, 308-09 (1999), and *United States Department of Treasury*

*v. Fabe*, 508 U.S. 491 (1993), as well as inconsistent with subsequent decisions by the Third

Circuit that did not reference the threshold test.  (*See* D.I. 29 at 2-3).  This Court disagrees that the

Report committed legal error on this issue.

First, it is noteworthy that more than one Third Circuit case explicitly notes a threshold

requirement exists when evaluating whether reverse preemption under the MFA applies.  For

example, in *Sabo v. Metropolitan Life Insurance Co.*, the Third Circuit explained:

> The threshold question in determining whether the antipreemption
> mandate of 15 U.S.C. § 1012(b) [the MFA] applies is whether the
> challenged conduct broadly constitutes the "business of insurance"
> in the first place.  15 U.S.C. § 1012(a).  If the contested activities
> are wholly unrelated to the insurance business, then the McCarran-
> Ferguson Act has no place in analyzing federal regulation because
> only when "[insurance companies] are engaged in the 'business of
> insurance' does the act apply."  *National Securities*, 393 U.S. at 459-
> 60[].

137 F.3d 185, 190 (3d Cir. 1998); *see also id.* at 191 ("We first ask whether the challenged activity

alleged in the complaint constitutes the 'business of insurance' in order to determine whether the

[MFA] applies.").  There, the Third Circuit agreed that the threshold requirement for application

of the MFA was satisfied by the character of MetLife's sales and marketing practices.  *See id.*

("MetLife's '50/50 plan,' 'churning' trades, and management's organized intimidation of sales agents, all strike at the insurance business 'core' enumerated in *National Securities* because they directly impact on the sale of insurance policies and ultimately affect the relationship between insurer and insured."). Three years later, in *Highmark*, the Third Circuit again found it appropriate to apply the threshold question at issue:

> To determine whether the McCarran Act applies, this Court considers the threshold question to be whether the activity complained of constitutes the "business of insurance." *Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185, 191 (3d Cir. 1998). If the activity does not constitute the "business of insurance," then the McCarran Act does not apply. *Id*. at 190. If, on the other hand, the activity does constitute the "business of insurance," we then look to whether § 1012(b) precludes a federal cause of action. *Id*. at 189. Federal jurisdiction is barred if three requirements are met: (1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law. *Id.*

276 F.3d 160, 166 (3d Cir. 2001). There, the Third Circuit agreed that the threshold requirement was satisfied for certain advertising performed by Highmark in connection with its insurance policies. *See id.* ("The Ad dealt with the scope and services offered by the insurers to their subscribers and thus concerned the 'business of insurance.'"). As the Court understands it, DDOI's argument is that the threshold test in *Sabo* and *Highmark* is no longer controlling as those cases are either overruled by or inconsistent with the Supreme Court's decisions in *Humana* and *Fabe*.

In *Humana*, decided after *Sabo* but before *Highmark*, the Supreme Court was confronted with the question of whether RICO's application to certain employee beneficiary claims should yield to Nevada state insurance law based on application of the MFA. *See Humana*, 525 U.S. at 307. There, the Supreme Court concluded that RICO did not "impair" the Nevada law within the meaning of the MFA because RICO did not directly conflict with the Nevada law, nor did it

frustrate any Nevada policy or interfere with the state's administrative regime.[6]   The other Supreme Court decision identified by DDOI is *Fabe*, which was also decided after *Sabo* but before *Highmark*.   In *Fabe*, the parties had agreed that the federal law at issue was not enacted to regulate insurance and, further, that it did "invalidate, impair, or supersede" the Ohio law at issue within the meaning of the MFA.   *See Fabe*, 508 U.S. at 501.   The only issue for the Court to decide was whether the Ohio statute was enacted for the purpose of regulating insurance, in which case it would preempt the federal law by operation of the MFA.   *Id.*   The Court concluded that the Ohio law was enacted for regulating insurance and was therefore controlling.   *See Fabe*, 508 U.S. at 504 ("The Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy.   Because it is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one 'enacted by any State for the purpose of regulating the business of insurance.'" (quoting 15 U.S.C. § 1012(b))).

The Court must reject DDOI's argument that *Humana* and *Fabe* implicitly overrule *Sabo* or that the threshold analysis in *Sabo* and *Highmark* is inconsistent with these Supreme Court decisions.   Notably missing from the Supreme Court's analysis in both *Humana* and *Fabe* is any consideration of the propriety of the threshold analysis challenged here.   Thus, as the Report recognized (D.I. 28 at 23-25), because no Supreme Court precedent has "clearly and unambiguously" spoken on the threshold issue, the Court should follow Third Circuit precedent and apply the threshold requirement that the conduct at issue be in the "business of insurance."

---

[6]     The Supreme Court also agreed that RICO did not invalidate or supersede the Nevada law at issue.   *See Humana*, 525 U.S. at 307-08.

That raises DDOI's additional objection:  that the Report erred by not considering post-*Highmark* Third Circuit decisions that purportedly did not apply a threshold test.  (*See* D.I. 29 at 2-4).  In particular, DDOI points to the decisions in *South Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138 (3d Cir. 2016), and *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010).  Initially, in *South Jersey Sanitation*, the conduct at issue was entering into (and ultimately failing to pay pursuant to) a reinsurance participation agreement relating to worker's compensation insurance, and the issue before the Court was whether the contract required arbitration.  *S. Jersey*, 840 F.3d at 140-42.  The Third Circuit found that arbitration was required and reversed the district court's denial of the defendant's motion to compel arbitration.  *Id.* at 144.  In its decision, the Third Circuit did not discuss reverse-preemption under the MFA.  *Id.* at 145-46 & 145 n.8.

That being said, even assuming that later Third Circuit opinions were in conflict with *Sabo* and *Highmark*, "'the holding of a panel in a precedential opinion is binding on subsequent panels.  Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel.  Court *en banc* consideration is required to do so.'"  *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting Policy of Avoiding Intra-circuit Conflict of Precedent, Internal Operating Procedures of the Third Circuit Court of Appeals § 9.1).  Accordingly, the Third Circuit "has long held that if its cases conflict, the earlier is the controlling authority and the latter is ineffective as precedents."  *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008).  Both *Sabo* and *Highmark* were precedential opinions and neither of the later Third Circuit opinions identified by DDOI were *en banc* considerations.  Indeed, the Court is not aware of any later Third Circuit *en banc* decision that calls into question the threshold analysis at issue here.  There is no basis to disregard the threshold analysis set forth in *Sabo* and

*Highmark* in view of later panel decisions.  Therefore, the Report was correct in concluding that, before addressing the substance of the reverse-preemption inquiry, a threshold analysis is required to determine whether the conduct at issue is the "business of insurance" such that MFA applies.

### B.     Whether the Challenged Conduct Constitutes the "Business of Insurance"

DDOI next objects that the Report incorrectly concluded that the "'challenged conduct at issue' does not constitute the 'business of insurance.'"  (D.I. 29 at 4; *see also id.* at 4-9).  DDOI first argues that the Report erred in finding that the challenged conduct was "'record maintenance' or 'the dissemination and maintenance of information, documents, and communications [maintained by the state].'"  (D.I. 28 at 25).  In DDOI's view, the conduct at issue here is actually "receiving, maintaining and restricting the dissemination of application and licensing information of captive insurers."  (D.I. 29 at 6).

As to the characterization of the conduct here, the Court finds no error in the findings of the Report.  DDOI attempts to portray the issue as one of statutory intent, arguing that the purpose of Section 6920 is "to promote transparency between the insurer and its regulator and provide a framework for the free flow of information in the licensing process."  (D.I. 29 at 5 (citing D.I. 17 ¶ 19)).  DDOI insists that the confidentiality restrictions are "necessary to not only receive full information from insurers relating to licensing, but also to receive information from other state insurance departments."  (D.I. 29 at 6).  Against this backdrop, DDOI asserts that the conduct here is more properly characterized as "receiving, maintaining and restricting dissemination of application and licensing information of captive insurers," which it argues is fundamental to insurance regulation.  (*Id.*).  The problem with DDOI's argument is that the ***purpose*** underlying Section 6920 is addressed later in determining whether challenged conduct constitutes the "business of insurance" – *i.e.*, not in simply describing the character of the challenged conduct.

Indeed, neither *Sabo* nor *Highmark* looked at any statutory purpose to describe the nature of the challenged activity.  *See Highmark*, 276 F.3d at 166 ("The District Court, without discussion, concluded that the advertising practices of the parties involved the business of insurance.  Although we are not referred to any appellate case squarely on point, we perceive no error in this conclusion. The Ad dealt with the scope and services offered by the insurers to their subscribers and thus concerned the 'business of insurance.'"); *Sabo*, 137 F.3d at 191 ("In this case, we agree with MetLife and its named employees that their activity constitutes the business of insurance.  The challenged conduct appearing in the plaintiff's complaint unquestionably centers around the insurance contract, and specifically the activities surrounding its sale and marketing.").

Here, the Court finds no error in the Report's conclusion that the challenged conduct itself is fairly characterized as "record maintenance" and, more specifically, the dissemination and maintenance of information, documents, and communications maintained by the state.  In the Court's view, this is a fair characterization because it flows directly from the language of Section 6920, which is what DDOI argues protects it from complying with the Summons. Section 6920 protects from disclosure broad swathes of information, not merely application and licensing information of captive insurers (as DDOI suggests).  *See, e.g.*, 18 *Del. C.* § 6920 (". . . all examination reports, preliminary examination reports, working papers, recorded information, other documents, and any copies of any of the foregoing, produced or obtained by or submitted or disclosed to the Commissioner that are related to an examination pursuant to this chapter . . . "). Given the broad scope of documents and information covered by Section 6920, the Report committed no error in characterizing the conduct at issue.

DDOI next argues that the Report erred in using the "wrong standard" to evaluate whether the challenged conduct of "record maintenance" is the "business of insurance."  (*See* D.I. 29 at 6).

In determining whether conduct constitutes the "business of insurance," courts examine three factors: "(1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry." *Sabo*, 137 F.3d at 191 (citing *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211-20 (1979)); s*ee also Ticor Title Ins. Co. v. F.T.C.*, 998 F.2d 1129, 1133 (3d Cir. 1993) (citing *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119 (1982)). In its objections, DDOI does not seriously challenge the actual application of the *Sabo* factors to the conduct at issue. Instead, DDOI's arguments are largely focused on the Report's designation of the conduct at issue (addressed above) and the purportedly improper use of the *Sabo* test in general (addressed below).

The *Sabo* factors are from the test articulated by the Supreme Court in *Royal Drug*, which involved a price-fixing claim arising under the Sherman Act – *i.e.*, an antitrust case. *See Royal Drug*, 440 U.S. at 207. DDOI seems to argue that application of the test is inappropriate in non-antitrust cases. (D.I. 29 at 8). To be sure, there are distinct clauses in the relevant section of the MFA – the first clause addressing laws enacted for the purpose of regulating insurance and the second clause addressing the reach of antitrust laws to the business of insurance. *See* 15 U.S.C. § 1012(b). But the problem with DDOI's argument is that the Third Circuit addressed that very concern in *Sabo*:

> Some courts have concluded that this three part test is simply not relevant in determining what constitutes the business of insurance in a non-antitrust context. We disagree. As *Fabe* makes clear, the *Royal Drug* test is only a starting point in the analysis for non-antitrust cases. However, because laws "enacted . . . for the purpose of regulating the business of insurance" necessarily encompass more than just the insurance business, the analysis here is broader.

*Sabo*, 137 F.3d at 191 n.3 (citations omitted); *see also Fabe*, 508 U.S. at 505 ("The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that

possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance. This category necessarily encompasses more than just the 'business of insurance.'" (citation omitted)). Therefore, as the Court understands it, the *Sabo* factors (derived from *Royal Drug*) are an appropriate starting point to determine whether the challenged conduct constitutes the "business of insurance" in non-antitrust cases, provided that the analysis does not end there. In this way, the Court agrees with the Report when it looks to the discussion of the "business of insurance" in the Supreme Court's opinion in *National Securities*. That case, which was not an antitrust case, provided guideposts as to what conduct constitutes the "business of insurance." *See Nat'l Sec.*, 393 U.S. at 460. Activities such as the fixing of insurance rates, selling and advertising of insurance policies, and the licensing of insurance companies and agents are clear examples of the "business of insurance." *Id.* Additionally, conduct relating to the insurance contract itself is also at the "core" of the "business of insurance" – *e.g.*, relationship between insurer and insured, the type of policy that may be issued, as well as "its reliability, interpretation, and enforcement." *Id.* Emphasizing that its list was non-exhaustive, the Supreme Court explained that "whatever the exact scope of the statutory term, it is clear where the focus [i]s – it [i]s on the relationship between the insurance company and the policyholder." *Id.*

The Report concluded that the conduct at issue is not the "business of insurance" because it does not fit within any of the categories of conduct set forth in *National Securities*, nor is it focused on the relationship between an insurance company and policyholder. (*See* D.I. 28 at 28-30). Instead, the conduct centers around the governmental treatment of documents provided by captive insurance companies – *i.e.*, whether confidential documents may be disclosed and under what conditions. (*Id.* at 29-30). The focus of the conduct is on the relationship between the captive insurance company and regulator(s), not an insurance company and its insureds. This Court finds

no error in that conclusion and has already rejected DDOI's attempts to characterize the conduct as fundamentally being about the licensing of insurance companies.  (*See infra* at 15).

As noted above, DDOI does not object to the Report's substantive conclusions for the three *Sabo* factors applied to the facts of this case.  Finding no clear error on the face of the record, this Court adopts the Report as to *Sabo* factors (D.I. 28 at 26-28), and this Court also adopts the further analysis under *National Securities* and the conclusion that the challenged conduct does not constitute the "business of insurance."

### C.     <u>Reverse Preemption</u>

Finally, DDOI argues that the Report erred in declining to apply the MFA to Section 6920. (D.I. 29 at 9-10).  Having found that the Report correctly determined that a threshold requirement exists and that it was not satisfied in this case, this Court concludes that the Report committed no error in refusing to reach the reverse-preemption issue on the merits.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, DDOI's objections are OVERRULED and the Report is ADOPTED.  The Government's Petition (D.I. 1) is GRANTED and DDOI's motion (D.I. 16) is DENIED.  An appropriate order will follow.